# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7861 | **DATE** | 7/9/2001 |
| **CASE TITLE** | SHIVAKUMAR vs. ABBOTT LABORATORIES et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 19 JULY 01 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Defendants Abbott Laboratories, Scarpelli and Ginger-Green's motion for summary judgment on plaintiff's FMLA claim  is denied.  Defendant Abbott Laboratories' motion for summary judgment on plaintiff's ADA and intentional infliction of emotional distress claims is granted. Only plaintiff's FMLA claim remains pending.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **number of notices** | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | **JUL 1 0 2001** | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | 🖎 | | |
| | Mail AO 450 form. | | C0-7 FILED FOR DOCKETING | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 01 JUL 10 AM 7: 43 | 7/9/2001 date mailed notice | |
| JS  ✗ | courtroom deputy's initials | | Date/time received in central Clerk's Office | JS mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| ANUSUYA H. SHIVAKUMAR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 7861 |
| | ) | |
| ABBOTT LABORATORIES; | ) | |
| GINGER GREEN-WILLIS; and MICHELLE | ) | |
| SCARPELLI | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |



## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Anusuya Shivakumar filed a three-count complaint against defendant Abbott

Laboratories ("Abbott") alleging violation of the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101 et. seq. and intentional infliction of emotional distress. Plaintiff also filed suit

against Abbott and defendants Ginger Green-Willis and Michelle Scarpelli alleging violation of the

Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et. seq. Defendants have collectively

moved for summary judgment on each of plaintiff's claims. For the following reasons, defendants'

motion is GRANTED as to plaintiff's ADA and intentional infliction of emotional distress claims,

and DENIED as to plaintiff's FMLA claim.

1

## STATEMENT OF FACTS[1]

Plaintiff Anusuya Shivakumar began working at Abbott in 1989. At the time of the events giving rise to this litigation, plaintiff was working as an accounting clerk in the accounting department of Abbott's Home Infusion Services. Part of plaintiff's work involved unstapling and separating envelopes and putting them together, restapling, making copies, and typing data into the computer system. Defendant Michele Scarpelli became plaintiff's supervisor in 1995. Scarpelli reported to Jim Watson, the accounting manager. Defendant Ginger Green-Willis was the Division's human resources manager.

On July 23, 1997, plaintiff experienced severe pain in her right arm while she was removing a heavy-duty staple. The pain did not go away, but plaintiff continued to perform her usual tasks at work during the following weeks. The pain increased over time, and plaintiff began losing sleep because of it. In August and early September 1997, plaintiff began mentioning her pain to Scarpelli. Scarpelli recommended that plaintiff visit Employee Health ("EH") so that Abbott could determine whether the injury was work-related for workers' compensation purposes. Plaintiff first sought medical attention on September 8, 1997. Plaintiff took the following two weeks off as vacation.

On September 22, 1997, plaintiff returned to work. The condition of her right arm had improved a little, but the pain persisted. Plaintiff went to EH on September 24, 1997. The nurse in EH, Larry Linderman, authorized plaintiff to return to work with "limited use of right arm, no repetitive motion right elbow." Because plaintiff's job had involved repetitive motions with her right elbow, the restriction on plaintiff's motion obliged Scarpelli to reallocate the workload within

---

[1] The following statement of facts comes from the parties' Local Rule 56.1(a) and 56.1(b) statements of material facts and accompanying exhibits.

the department. Rather than having the clerks in the department process their own batches of payments from start to finish, the processing of payments was broken down into steps so that plaintiff would theoretically use her left arm, and not her right. This resulted in plaintiff doing work one-handed, and attempting to operate the photocopier with her left hand only. Plaintiff never told Nurse Linderman or anyone in EH that she was dissatisfied with Abbott's September 24, 1997 restrictions.

In late September 1997, plaintiff filed a claim with Abbott for disability benefits. Her personal doctor, Dr. Schimel, completed the forms. Dr. Schimel's evaluation of plaintiff indicated no limitations on plaintiff's ability to use her left hand, but some limitations on her right hand. By October 2, 1997, working under the restrictions was having a negative effect on plaintiff's left arm. Plaintiff returned to EH, where she told Nurse Linderman that her left arm was "not sore or painful, its [sic] just tired at the end of the day." Nurse Linderman gave her another set of restrictions, which stated: "Limited use of right arm. Can lift up to 10 lbs. No firm grasping. No power pinch." When plaintiff returned from EH on October 2, 1997, she told Scarpelli that she wanted to go back to doing her work as usual. Plaintiff's pain continued to worsen, and she would ice her arms and wear a brace while at work.

On October 22, 1997, plaintiff returned to EH and was given another set of restrictions, this time including her left arm. The restrictions were what plaintiff wanted; plaintiff did not want anything different than the restrictions she received. That same day she provided another disability evaluation completed by Dr. Schimel. On October 31, plaintiff complained to Scarpelli that her left arm was bothering her and that she wanted to use her right arm. Scarpelli responded that she had to follow EH's work restrictions until plaintiff had them changed, and that Scarpelli could not

3

change plaintiff's duties. Plaintiff responded that she knew her own body, and that she was using her right arm anyway.

On November 7, 1997, plaintiff saw Dr. Fertelmeister, Abbott's doctor at EH. The restrictions plaintiff had been working under had not improved her condition and her ability to perform her job functions. Plaintiff told Dr. Fertelmeister that she would prefer to work with both arms as she had before. Dr. Fertelmeister diagnosed plaintiff with epicondylitis and tendinitis, and ordered that plaintiff type for no more than two hours per day, alternating copying and sorting with short breaks every two hours. Plaintiff then tried working with those restrictions.

During this time period, Abbott also arranged for an ergonomic assessment of plaintiff's work space by Tom Straits, an Abbott ergonomic specialist, and a second ergonomic review by Elaine Kempers, an outside specialist. Straits showed plaintiff how to position her chair and keyboard. Plaintiff had an electric stapler, but requested an electric sample remover. Neither plaintiff nor anyone at Abbott was ever able to locate such a product. Scarpelli told plaintiff that Abbott would order anything Straits recommended. Plaintiff asked the department secretary to order a calculator and a footrest. Kempers also made adjustments to plaintiff's sitting area, and recommended a special chair and lowering plaintiff's shelf so she could reach them without stretching. Plaintiff's shelves were never lowered, but she never lowered them herself or asked anyone else to lower them for her. Plaintiff never received the chair Kempers recommended, but she did get a footstool.

Plaintiff returned to EH on November 18, 1997, and Dr. Fertelmeister issued a new set of restrictions. On November 20, 1997, Abbott sent plaintiff to Dr. Jay Pomerance for an opinion regarding whether plaintiff's condition was the result of an injury on the job because plaintiff had

4

filed a worker's compensation claim. Around this time, Abbott began requiring plaintiff to keep a daily log of the tasks she performed and when she performed them.

On Friday, November 21, 1997, plaintiff requested time off so that she could rest her arms. As plaintiff recounts the events of the day, plaintiff told Scarpelli that she was in acute pain and not able to sit or stand or look at the screen, and inquired as to whether there was any sort of a break she could take. Scarpelli responded: "You don't have any vacations, so, no, you cannot take off." Plaintiff asked if she could go on medical leave or personal unpaid leave. Scarpelli responded: "No, you cannot. You don't have any vacation left." Plaintiff inquired whether Abbott provided anything for her situation, and asked Scarpelli to check the manual to see. Scarpelli left, returned after five minutes, and told plaintiff: "No, you don't have any vacation left. You are going to work through December."

The following Monday, November 24, 1997, plaintiff saw Dr. John Lin, an associate of Dr. Schimel. Dr. Lin diagnosed plaintiff with chronic brachial/radialis tendinitis, recommended that she not do any repetitive motions with her arms, and excused her from work for two days. Dr. Lin's note concluded by saying that plaintiff "may return to work on 11/26/97." On that same day, November 24, 1997, plaintiff saw Dr. Fertelmeister and gave her Dr. Lin's note. Dr. Fertelmeister expressed the opinion that plaintiff did not need the two days off. Plaintiff worked that day, November 24, and at the end of the day, she gave Dr. Lin's note to Scarpelli without talking to her. Scarpelli then followed plaintiff out of the office to her car in order to ask what the note was all about. Plaintiff took off the next two days, November 25 and November 26. Dr. Fertelmeister called plaintiff at home on the 25th to tell plaintiff that she did not approve of plaintiff taking the time off. November 27 and 28 were Abbott holidays for Thanksgiving. Abbott later criticized plaintiff for taking off the

26th without calling in to her supervisor and questioned plaintiff about why she had taken the 25th and 26th off, when Dr. Lin's note stated that she could return to work on the 26th. Plaintiff explained that the note was supposed to be for the 25th and 26th, but she never told Dr. Fertelmeister that the note had the wrong date on it, and Dr. Lin never corrected his note to indicate that he had made a mistake and that the note should have stated a return to work date as the 27th, not the 26th.

On Saturday, November 29, 1997, plaintiff returned to Dr. Lin. This time, Dr. Lin found that plaintiff was also suffering from severe degenerative disc disease of the neck. His note also stated:

> She is being treated with medicines and physical therapy. Rest from work would help or less ROM [Range of Motion] of neck would also be helpful. Questions? Please call. I would recommend 2 weeks off from work so that she can do physical therapy/exercise.

Plaintiff did not return to work on Monday, December 1, 1997. Plaintiff called Watson, the accounting manager, that day and said that she was "still sick." Scarpelli then called plaintiff at home, and was told by plaintiff's husband that she was at a physical therapy session. At Scarpelli's request, plaintiff reported to EH on December 2, 1997, but did not do any work. On December 2, 1997, plaintiff presented Dr. Lin's November 29, 1997 note to Dr. Fertelmeister. Dr. Fertelmeister had also reviewed the report from Dr. Pomerance, whom plaintiff had seen on November 20, and concluded that Dr. Pomerance was recommending plaintiff's return to work without restrictions. Dr. Fertelmeister then called Dr. Lin on the telephone. After that phone call, without examining plaintiff, Dr. Fertelmeister revoked all of plaintiff's work restrictions and declared her fit for normal work, despite plaintiff's complaints of continuing pain. Plaintiff begged not to be sent back to work without restrictions. Dr. Lin submitted an affidavit in connection with this litigation stating that he never revoked any of his recommendations for plaintiff's care and work restrictions.

Plaintiff called in sick again the following day, December 3, 1997. Plaintiff called Michael Anderson, Director of Employee Relations in Abbott's human resources department. Plaintiff asked for medical leave. Anderson told her that the doctors agreed that medical leave was unnecessary and she should see her manager. During the conversation between Anderson and herself, plaintiff complained that she was following her own doctor's orders not to return to work, and that Abbott was overruling her doctor's orders. During this time, plaintiff was not given written notice of the need to provide a written request for leave or medical certification of the need for leave.

Plaintiff returned to work for the first time since November 25 on December 4, 1997. Plaintiff's productivity had declined markedly by the time she returned to work. Scarpelli told plaintiff that since her restrictions had been lifted, she was expected to work at full capacity. Plaintiff then met with Watson and discussed plaintiff's problems with her work restrictions being lifted and having to keep a log of her work. After that discussion, Plaintiff saw Dr. Lin for a third time. Plaintiff testified that Dr. Lin was "furious" that Abbott did not give her leave, and that he had not agreed to lift the restrictions. Dr. Lin gave plaintiff a third note, this time describing her symptoms, his diagnosis, and his recommendation for "physical therapy and light duty (no repetitive movements of arm and neck) for these symptoms." Dr. Lin concluded the note by stating that he was awaiting the results of an EMG before giving further recommendations.

Later on December 4, 1997, plaintiff returned to EH and gave Dr. Lin's December 4 note to Dr. Fertelmeister. Dr. Fertelmeister responded that she did not know "what kind of relationship" plaintiff had with Dr. Lin, and recommended that plaintiff apply for medical or personal leave. Plaintiff asked Dr. Fertelmeister to arrange for the leave, but she declined, saying that it was a matter between plaintiff's manager and human resources. Dr. Fertelmeister issued a new set of restrictions

which stated: "Restrict typing to 2 hrs./day and alternate copying and sorting. No hyperextension of the neck. Please allow 5 mnt. break every 2 hrs." Plaintiff did not tell Dr. Fertelmeister that Dr. Lin still wanted her to take two weeks off, or that Dr. Fertelmeister's new restrictions were different than what Dr. Lin wanted.

That afternoon, plaintiff met with Scarpelli, who talked about the work she expected plaintiff to perform with her restrictions and, according to plaintiff, berated plaintiff for failing to keep Scarpelli informed of all her appointments with doctors and physical therapists. Scarpelli was especially unhappy that plaintiff had informed Watson, but not her, about that day's appointment with Dr. Lin. Scarpelli admits that she was frustrated with plaintiff, that she raised her voice, and that she considered plaintiff's attitude to be insubordinate.

The following day, December 5, 1997, plaintiff went to work and visited Henry Weishaar, her divisional vice president of human resources. Plaintiff explained her situation to him, and asked to be allowed to take unpaid medical leave. According to plaintiff, Weishaar initially informed her that she did not have to fill out the log, but later told her she had to do her best to complete it. Plaintiff turned in the completed log by the end of the day.

On the afternoon of December 8, plaintiff was called into Watson's office and presented with a detailed final warning memorandum. One of the memorandum's terms was that plaintiff not leave her work station without notifying "management." Plaintiff refused to sign it, asking to discuss the matter the next day. Plaintiff was informed that she must comply with the memorandum's terms even if she did not sign it, or else she would be fired.

Plaintiff's condition worsened under the stress of the memorandum. She returned to work the following day, December 9. Because she did not feel well, plaintiff looked for Scarpelli but

could not find her. Accordingly, plaintiff went to Watson, and told him that she was going to EH. Plaintiff maintains that Watson assented to her request to go to EH. Plaintiff "hoped" that EH would send her home or give her medications, but plaintiff did not request EH to provide her with either medication or a day off. Instead, Nurse Linderman wrote out a new set of restrictions for plaintiff and sent her back to work. When Scarpelli learned that plaintiff had gone to EH without consulting her, she decided to fire plaintiff. She obtained the permission of Green-Willis and Weishaar. On December 9, 1997, plaintiff was called into Watson's office and told that she was fired for violating the terms of the December 8, 1997 memorandum.

After her termination, plaintiff applied for and received temporary Social Security disability benefits. Plaintiff attended a pain clinic for a month, and finished a pain management program in September 1998. At that point, plaintiff felt that she would have been capable of returning to her regular job at Abbott.

## STANDARD OF REVIEW

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in the nonmovant's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1996). This court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.

A party who bears the burden of proof on a particular issue, however, may not rest on its

pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 106 S. Ct. 2548, 2553 (1986). There is no issue for trial "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511.

ANALYSIS

I.    <u>Family and Medical Leave Act Claim</u>

Defendants argue that they are entitled to summary judgment on plaintiff's FMLA claim because there is no evidence that plaintiff ever properly requested leave in accordance with the statute and Abbott's policies. Defendants additionally argue that, even if plaintiff's oral requests for leave are treated as proper FMLA leave requests, denial was appropriate in light of Dr. Lin's revocation of his recommendation for a two week leave. This court finds that there are material issues of fact regarding whether plaintiff made a proper FMLA leave request and as to whether defendants properly denied that leave.

First, there is a question of fact as to whether plaintiff had a "serious health condition" entitling her to FMLA leave. It is undisputed that plaintiff was diagnosed with a "medical condition," and plaintiff has come forward with evidence that her condition involved a period of incapacity (i.e., inability to work) of more than three consecutive calendar days. <u>See</u> 29 C.F.R. § 825.114(a)(2)(i). Second, there is an issue of fact as to whether plaintiff furnished notice of her need for FMLA leave consistent with statutory and Abbott's requirements. Defendants argue that plaintiff never specifically requested FMLA leave in late November or early December of 1997, and that she never put her request in writing or provided medical certification of her need for leave. However, the FMLA does not require employees to "expressly assert rights under the FMLA or even mention

10

the FMLA, but may only state that leave is needed." 29 C.F.R. § 825.303(b). "The employer will be expected to obtain any additional required information through informal means." Id.; see also Price v. City of Fort Wayne, 117 F.3d 1022, 1026 (7th Cir. 1997) ("The FMLA does not require that an employee give notice of a desire to invoke the FMLA. Rather, it requires that the employee give notice of need for FMLA leave. This kind of notice is given when the employee requests leave for a covered reason. After a notice of this sort the employer can inquire further to determine if the FMLA applies."). Plaintiff contends that she requested some sort of leave because of her medical condition, and stated repeatedly that she "could not work." Those statements are sufficient to create a genuine dispute as to whether defendants' obligations under the FMLA were triggered.

Defendants rely particularly on Dr. Lin's alleged withdrawal of his recommendation for a two week leave as evidence that plaintiff's request was not proper. However, plaintiff disputes that Dr. Lin withdrew that recommendation, and Dr. Lin filed an affidavit stating that he did not withdraw his November 29, 1997 recommendation for a two week leave.[2] Moreover, plaintiff's obligation to provide medical certification of her need for leave was not even triggered until defendants requested that certification; plaintiff had no obligation under the FMLA to provide medical certification of her need for leave before or contemporaneous with her request for it. See 29 U.S.C. § 2613; 29 C.F.R. § 825.305(a); see also 29 C.F.R. § 825.301(f) ("If an employer fails to

---

[2]Even if Dr. Lin's December 4, 1997 note recommending "light work" duty for plaintiff is considered dispositive that Dr. Lin eventually withdrew his leave recommendation, it is not dispositive as to whether he had withdrawn that recommendation on December 2, 1997, the day plaintiff claims she requested, and was denied outright, medical leave. Moreover, even if it were undisputed that Dr. Lin withdrew his recommendation, plaintiff's characterization of her request for leave is sufficient to create a genuine dispute that plaintiff invoked her rights to FMLA leave, thus obligating defendants to follow that statutory procedures and their own policies before denying that leave.

provide notice in accordance with the provisions of this section, the employer may not take action against an employee for failure to comply with any provision required to be set forth in the notice."). If defendants doubted the need for the leave recommended by Dr. Lin, they had the right to require plaintiff to obtain the opinion of an independent second health care provider designated or approved by Abbott. 29 U.S.C. § 2613(c)(1).

Defendants also maintain that even if there is an issue of fact regarding Abbott's compliance with the FMLA, summary judgment should be granted in favor of the two individual defendants, Ginger Green-Willis and Michelle Scarpelli, because plaintiff has come forward with no evidence that she properly requested leave from them. However, plaintiff testified that she requested leave from Scarpelli. In addition, Green-Willis testified that plaintiff told her that plaintiff could not work in her present state, and that she told plaintiff that plaintiff could be terminated if she did not return to work. These conversations are sufficient to raise a genuine dispute as to whether plaintiff properly requested FMLA leave of each of the individual defendants, and if so, whether the individual defendants properly denied that leave.

## II.  Americans with Disabilities Act Claims

Plaintiff claims that defendants discriminated against her in violation of the ADA by: (1) terminating her employment rather than granting her a two week leave, and (2) failing to reasonably accommodate her disability prior to her termination. Defendants moved for summary judgment on plaintiff's ADA claims on several basis, including: (1) plaintiff was not "disabled" within the meaning of the ADA, (2) plaintiff was not a qualified individual within the meaning of the ADA, and (3) defendants provided reasonable accommodation for plaintiff's alleged disability.

The ADA provides, in pertinent part: "No covered entity shall discriminate against a

qualified individual with a disability because of the disability of such individual in regard to . . .
discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C.
§ 12112(a). The same section defines discrimination, in part, as "not making reasonable
accommodations to the known physical or mental limitations of an otherwise qualified individual
with a disability who is an applicant or employee." 42 U.S.C. S 12112(b)(5)(A). Reasonable
accommodation may include such things as job restructuring and part-time or modified work
schedules. 42 U.S.C. § 12111(9)(B). An employer is not obligated to provide an employee the
accommodation she requests or prefers; the employer need only provide some reasonable
accommodation. Schmidt v. Methodist Hospital, 89 F.3d 342, 344- 45 (7th Cir. 1996).

For purposes of this motion, this court assumes that plaintiff has raised a genuine dispute that
her tendinitis, epicondylitis, and degenerative disc disease constituted a disability within the meaning
of the ADA, though the Seventh Circuit has expressed scepticism whether conditions such as
plaintiff's are sufficiently limiting of one or more major life activities to constitute a disability
under the ADA. See EEOC v. Hamilton-Keeling, Inc., 227 F.3d 1024, 1026 (7th Cir. 2000)
(questioning whether "tennis elbow" is a disability under the ADA); 42 U.S.C. § 12102(2).
However, this court finds that plaintiff has not raised a genuine dispute as to whether she was a
"qualified individual with a disability" within the meaning of the ADA at the time she was
terminated, so that her ADA claim arising out of her termination must fail. In addition, this court
finds that plaintiff has failed to raise a genuine dispute as to whether defendants failed to reasonably
accommodate her alleged disability while she was still employed at Abbott.

A.    Termination Discrimination and Failure to Accommodate Claim

The ADA proscribes discrimination against only "qualified individual[s] with a disability."

42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined, in relevant part, as: "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(9). Whether someone meets the definition of a "qualified individual with a disability" involves a two-step determination. 29 C.F.R. app. § 1630.2(m). First, the court considers whether "the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Id. If she does, then the court must consider "whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." Id. The determination as to whether an individual is a "qualified individual with a disability" must be made as of the time of the employment decision. Id. The plaintiff bears the burden of proof on this issue; she must be able to show that she is a "qualified individual with a disability" in order to successfully prosecute an ADA claim. See DeLuca v. Winer Indus., Inc., 53 F.3d 793, 797 (7th Cir. 1995). Defendants do not dispute whether plaintiff satisfied the prerequisites for the position, but they do argue that plaintiff was not a qualified individual with a disability at the time of her termination because she was not able to perform the essential functions of her job, even with reasonable accommodations.

This court agrees with defendants that, at the time of plaintiff's discharge, she was not a qualified individual with a disability as defined by the ADA. Plaintiff herself admits that, at the time of her discharge, she "couldn't do anything." In spite of this admission, plaintiff argues that she would have been able to work if she had only been given a two week medical leave, as recommended by Dr. Lin on November 29, 1997. Thus, plaintiff argues, she was a qualified individual with a disability because she would have been able to work with a reasonable

14

accommodation of a two week medical leave. However, plaintiff's "evidence" in support of this argument is insufficient to create a genuine dispute that plaintiff would have been able to perform the essential functions of her job had she been given the two week break she requested.

In support of her argument that she would have been able to perform the essential functions of her job if she had been given a two week break, plaintiff submitted an affidavit from Dr. Lin stating that: "It is reasonable that Ms. Shivakumar would have experienced an improvement in her symptoms and increased function in her arm if she followed the recommendation I offered and was allowed to take time off from work." Dr. Lin's statement is insufficient to create a genuine dispute that the two week break he initially recommended was a reasonable accommodation. First, Dr. Lin opined only that plaintiff's symptoms would have improved, not that she would have been able to perform the essential functions of her job. Second, Dr. Lin offered no opinion as to how long of a break would have been necessary to return plaintiff to a state in which she could perform the essential functions of her job or the basis of his opinion that a break would have improved plaintiff's symptoms. This case is thus like <u>Weigel v. Target Stores</u>, 122 F.3d 461 (7th Cir. 1997), in which the Seventh Circuit found a treating psychologist's unsupported opinion insufficient to create a genuine dispute that the plaintiff would have been able to perform the essential functions of her job. <u>Id.</u> at 468-69. Finally, Dr. Lin's affidavit is contradicted by his own actions and recommendations at the time of the events which gave rise to this litigation. At time of plaintiff's termination on December 9, 1997, Dr. Lin had effectively withdrawn his recommendation for two week break by recommending light duty and other work restrictions for plaintiff on December 4, 1997.

Plaintiff also attempts to create a genuine issue of fact by arguing that she felt better and felt that she would have been able to return to work in September, 1998 after attending a month-long

15

pain clinic. Plaintiff argues that, if defendants had only accommodated her in December, 1997, she would have been able to receive such treatment at that time, and thus been able to perform the essential functions of her job when she returned. In so arguing, plaintiff ignores the fact that the greatest leave ever recommended (and then effectively revoked) by her doctor prior to her termination was two weeks, not a month, and her doctor did not recommend the sort of pain clinic plaintiff later attended. Plaintiff also avoids the fact that when she attended this pain clinic in September, 1998, she had not been working for nine months, and thus already had a nine month rest-from-work period. This court finds that plaintiff's evidence that she would have been able to perform the essential functions of her job after not working for nine months and attending a month-long pain clinic does not create a genuine dispute that she would have been able to perform the essential functions of her job if she had been given a two week break from work.

In a final attempt to create a genuine dispute on this point, plaintiff points to her own opinion that she would have been able to work if she had been given a two week break. However, plaintiff's own conclusion that she "knows her own body" and would have been able to work if she had been given a two week leave of absence is not sufficient to create a genuine dispute that a two week leave of absence was a "reasonable accommodation" which would have enabled plaintiff to perform the essential functions of her job. Plaintiff offers no competent evidence in support of her opinion, and her own conclusion is not sufficient to defeat summary judgment. See McPhaul v. Board of Com'rs of Madison County, 226 F.3d 558, 964 (7th Cir. 2000) ("All that McPhaul can present in support of her reasonable accommodation claim is her own self-serving testimony, and in this case, that is just not sufficient for a reasonable jury to find that she is a qualified individual with a disability under the ADA.").

16

Finally, it should be noted that plaintiff has failed to produce any evidence to rebut defendants' argument that she was not "qualified" under the ADA because of her "erratic, unexplained absences," which can make an employee unqualified "even when those absences are a result of a disability." EEOC v. Yellow Freight System, Inc., No. 99-3415, 2001 WL 641800, *4 (7th Cir. Jun. 12, 2001) ("In addition to possessing the skills necessary to perform the job in question, an employee must be willing and able to demonstrate these skills by coming to work on a regular basis. Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'") (quoting Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999)). Plaintiff has an undisputed history of repeated absences. Given plaintiffs' undisputed inability to come to work on a regular schedule, her inability to perform her duties from home, and her status as a full time employee without the discretion to decline work when she chose to do so, see id., plaintiff was "not qualified" for these reasons, as well.

Because plaintiff has produced no competent evidence that any reasonable accommodation would have enabled her to perform her job, plaintiff was not a "qualified individual" as defined by the ADA at the time of her termination, and summary judgment on her ADA termination claim is thus proper. See Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 900 (7th Cir. 2000).

B.    Pre-termination Failure to Accommodate Claim

Plaintiff also claims discrimination in defendants' failure to accommodate her disability prior to her termination both in failing to give her a two week leave of absence after being presented with Dr. Lin's recommendation on December 2, 1997 and in other various failures to re-arrange her work

station and job duties so as to minimize injury to her arms and neck.

Plaintiff's argument that defendants failed to reasonably accommodate her by giving her a two week leave beginning on December 2, 1997, when plaintiff presented them with a note from Dr. Lin recommending a two week break, is easily disposed of. First, this court has already concluded that at the time of plaintiff's termination on December 9, 1997, she was not qualified to perform the essential functions of her job, and thus not protected by the ADA. Prior to that time, the only period in which plaintiff had an arguable claim to a two week leave of absence being a reasonable accommodation was from December 2, 1997 (when she presented Dr. Lin's December 2, 1997 note recommending a two week break) to December 4, 1997 (when plaintiff presented Dr. Lin's December 4, 1997 note recommending light duty and other work restrictions). However, it is undisputed that plaintiff did not work between December 2 and December 4, 1997, even though defendants ordered her to return to work without restrictions. As such, plaintiff never worked at a time during which her doctor was recommending that she take a medical leave. Dr. Lin's sworn statement that he did not withdraw his recommendation for a two week break on December 2, 1997 is not sufficient to create a genuine dispute that defendants failed to reasonably accommodate plaintiff between the time Dr. Lin recommended a two week break on November 29, 1997 and the time he recommended light duty, which by necessity includes work, on December 4, 1997 because plaintiff did not work during that time, and Abbott did not penalize plaintiff for taking time off.

As for plaintiff's other arguments that defendants failed to accommodate her disability by providing certain ergonomic changes to her work station or adjusting her work duties, plaintiff offers no specific evidence of accommodations which plaintiff requested and was not granted. Plaintiff alleges several times that the changes defendants made in her work duties did not relieve her pain,

but does not point to an instance in which she asked for an accommodation which her doctors recommended and was not granted. Defendants cannot be faulted for following plaintiff's personal physician's recommendations. <u>Steffes v. Stepan Co.</u>, 144 F.3d 1070, 1072 (7th Cir. 1998) (employer could not be faulted for following restrictions set by plaintiff's doctor where plaintiff and doctor failed to clarify or explain need for different restrictions). For example, plaintiff complains that limiting work to her right arm caused her left arm to hurt and that she requested to go back to her normal work load. However, plaintiff does not point to a doctor's recommendation that she not use her left arm or any other doctor's recommendation that defendants did not comply with. Moreover, the undisputed evidence shows that defendants engaged in the sort of "interactive process" that is required by the ADA. To the extent plaintiff did not make her wishes for accommodations such as a better chair or lowered shelves known, defendants cannot be faulted for failing to provide them. See <u>Beck v. University of Wisconsin Bd. of Regents</u>, 75 F.3d 1130, 1136 (7th Cir. 1996) ("Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the [interactive] process."). To the extent plaintiff did request additional accommodations, such as less work, an employer is not obligated to provide an employee the accommodation she requests or prefers, but need only provide some reasonable accommodation. <u>Schmidt v. Methodist Hospital</u>, 89 F.3d 342, 344- 45 (7th Cir. 1996). Here, as in <u>Beck</u>, plaintiff bears responsibility for failure to isolate the necessary specific accommodations because Abbott never knew exactly what action it needed to take; plaintiff points to no facts indicating that Abbott obstructed her effort to acquire reasonable accommodations. See <u>Beck</u>, 75 F.3d at 1136. Plaintiff does not argue that defendants could have reasonably granted her any

accommodations, other than a leave of absence (which this court has already found to have been unreasonable), which would have made her able to perform the essential functions of her job.

III.   Intentional Infliction of Emotional Distress Claim

In order to survive this motion for summary judgment on her intentional infliction of emotional distress claim, plaintiff must create a genuine dispute that: (1) defendants' conduct was extreme and outrageous; (2) defendants either intended that their conduct should inflict severe emotional distress, or knew that there was a high probability that their conduct would cause severe emotional distress; (3) defendants' conduct in fact caused severe emotional distress. Doe v. Calumet City, 161 Ill. 2d 374, 392, 641 N.E.2d 498, 506 (1994). Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." Graham v. Commonwealth Edison Co., 318 Ill. App. 3d 736, 745, 742 N.E.2d 858 (1st Dist. 2000). Liability only attaches in circumstances where the defendant's conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." Id., 742 N.E.2d at 866 (internal quotations omitted). The distress inflicted must be so severe that no reasonable person could be expected to endure it. Id., 742 N.E.2d at 866. Courts often hesitate to find a claim for intentional infliction of emotional distress in employment situations. Vickers v. Abbott Laboratories, 308 Ill. App. 3d 393, 410, 719 N.E.2d 1101, 1115 (1999). Courts are concerned that, if everyday job stresses resulting from discipline, personality conflicts, job transfers or even terminations could give rise to a cause of action for intentional infliction of emotional distress, nearly every employee would have a cause of action. Id., 719 N.E.2d at 1115. Moreover, the Seventh Circuit has ruled that allegations of low-level harassment by employers, even when in violation of discrimination statutes, are not sufficient to state a claim for intentional infliction of emotional distress. Harriston v. Chicago Tribune Co.,

20

992 F.2d 697, 703 (7th Cir. 1993).

With these principles in mind, this court finds that no reasonable jury could find that defendants engaged in conduct so severe that no reasonable person could be expected to endure it. The worst evidence of harassment plaintiff points to in opposition to this motion is Scarpelli's yelling at her and following her to her car to question her about unexcused absences and Dr. Fertelmeister's telling her that she did not believe that plaintiff was unable to work while questioning plaintiff's relationship with Dr. Lin. These actions do not rise to the level of "extreme and outrageous conduct" under Illinois law. Accordingly, summary judgment on plaintiff's intentional infliction of emotional distress claim is proper.

## CONCLUSION

For the reasons stated, defendant Abbott, Scarpelli, and Ginger-Green's motion for summary judgment on plaintiff's FMLA claim is DENIED in its entirety. Defendant Abbott's motion for summary judgment on plaintiff's ADA and intentional infliction of emotional distress claims is GRANTED. Accordingly, only plaintiff's FMLA claim remains pending in this litigation. The parties are encouraged to discuss settlement of this litigation. This case is set for report on status on July 19, 2001 at 9:00 a.m..

ENTER:

JAMES F. HOLDERMAN
United States District Judge

DATE: July 9, 2001